## JOHN WATSON v. THE STATE.

### No. 6345. Decided June 12.

1. **Murder—Charge of the Court.**—The indictment charged that the appellant and one Brown "acted together" in the murder of the deceased, and the court instructed the jury that "if the defendant, acting by himself or acting together with one Brown," etc. To this charge it is objected that the indictment, charging only a joint murder by appellant and Brown, it contravenes the rule that the charge must be limited to the offense charged in the indictment. But *held* that the objection in this instance is hypercritical, and that the words "acted together" used in the indictment must be treated as mere surplusage. See the opinion on the question.

2. **Same—Weight of Evidence.**—The trial court charged the jury as follows: "The mere presence of a party at the time and place where an offense is committed does not constitute such party a principal; he must be present at that time and place with a knowledge of and participation in the offense. Of this the jury are to judge from the surrounding circumstances in proof, such as the companionship of the parties and the conduct of the parties at, before, and after the commission of the offense." *Held*, that this charge under the evidence adduced is not obnoxious to the objection that it is upon the weight of evidence.

3. **Same—Alibi.**—Although the defense of alibi was not made on the trial the court charged the jury as follows: "If you do not believe that defendant was present at the time of the killing you will acquit him.' *Held*, that being more favorable to the defendant than he was entitled to, the said charge is not subject to objection.

4. **Practice—Privilege of Counsel.**—Objections to remarks used in argument by State's counsel come too late when raised for the first time on motion for a new trial. Objections must be made at the time and perpetuated by bill of exception; otherwise they will be revised only when material injury to the defendant is manifest.

5. **Same—Transcript.**—Papers brought up with the record which constitute no part of the transcript can be considered for no purpose by this court.

6. **Murder—Fact Case.**—See the statement of the case for evidence held sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Robertson. Tried below before Hon. J. N. Henderson.

The appellant and W. R. Brown were jointly indicted for the murder

of M. McCoy, in Robertson County, Texas, on the 18th day of May, 1888. Being alone upon trial the appellant was convicted of murder in the second degree and his penalty was assessed at a term of eleven years in the penitentiary.

Mrs. McCoy, the widow of the deceased, testified for the State that her husband, riding his certain large bald-faced horse, left his home on Head's Prairie, in Robertson County, about half-past two o'clock on the afternoon of May 18, 1888, to look for a cow. He left all the weapons he owned at home and was unarmed. Later on that evening the witness saw him on Duck Creek, about a mile and a half distant from home. He lay on the ground, breathing but unconscious, his feet extended towards the head of his dead horse. Witness had her husband carried home and he died about ten o'clock on the next morning, never having regained consciousness. Bad feeling existed between the deceased and defendant at the time of the death of the former, and had for two years. They once had a law suit in which the defendant prevailed. Deceased lived about two miles distant from Headville postoffice, which he was in the habit of visiting on mail days, going generally in the afternoon, occasionally in the forenoon, but never at or near noon. Defendant, who had once lived with deceased, was familiar with defendant's habits.

T. J. Holton, a witness for the State, described a difficulty or quarrel which occurred between deceased and defendant in December, 1887, in the course of which the defendant's pistol was drawn.

John Brooks testified for the State that he went to Bremond with deceased about ten days before his death to look for the hides of cattle he, deceased, had lost. The hides were found in Schmidt's hide house in Bremond. The witness was at the place where the deceased's body was found before the body was removed, and was one of a party who went to deceased's house before Mrs. McCoy returned with the body. On reaching the house the witness looked for deceased's pistol and found it in a drawer.

Homer Carson testified for the State that on the Sunday preceding the fatal Friday at the old Ben Brown place, he heard one Walter Hand tell the defendant and W. R. Brown that McCoy accused them of stealing his cattle. W. R. Brown laughed, but defendant in reply to Hand said, "McCoy has sat on me long enough, and if he don't mind how he talks about me I will make him afraid to hunt his cattle." Joe Davis and one or two other parties were present.

C. J. Wilson testified for the State that a few days before the killing of McCoy, the defendant, in the course of a conversation with him about recent thefts of McCoy's cattle, asked witness if McCoy did not give "them fellows" a bad name. Witness replied, "He has never done so to me, but certain persons have told McCoy about certain other persons driving his cattle." Defendant replied, "I am afraid that McCoy has

said too much for his own good." On the afternoon of the fatal day the witness was at work in the Greer field, about a quarter of a mile from the place where the shooting of McCoy took place. While at his work he saw two men, riding small horses or ponies, pass the field going in the direction of where the shooting took place. In the man next to him he distinctly recognized W. R. Brown. He observed no guns in the hands of either man, but he did not think he could have seen guns in their hands unless carried on the shoulder. About fifteen minutes later the witness heard a cry which he supposed at the moment proceeded from a squirrel hunter. Immediately after the cry a gun was fired. The shot was followed by a cry of distress, and that cry almost instantly by another shot. The witness then heard the barking of McCoy's dogs. All of these sounds proceeded from or near the place where McCoy and his dead horse were afterwards found. At about dusk, which fell an hour and a half after the shooting, the witness reached McCoy, finding Frank Chapman there. Soon afterwards W. Dove, W. and Si Roberts, Mr. Brooks, L. Chapman, George Davis, Jim Williams, and John Pickens came—all of said parties, including witness, being on foot. McCoy lay on his back, his right arm drawn backwards under him. No weapon of any kind was found on the ground, but in the right pocket of McCoy's sack coat the witness found a 38-caliber rim fire pistol. It was wedged in the pocket, the muzzle pointing forward, and it required the use of both of witness's hands to take it out. The pistol in evidence is the same, or one very like it. McCoy's horse lay dead a few feet distant from where McCoy was lying. Mrs. McCoy reached her husband about thirty minutes after the witness did.

The witness saw the defendant and W. R. Brown on the next morning. J. D. McCutcheon came to the witness and told him that defendant and Brown wanted to see him. Witness went with McCutcheon to the corner of Bates's field on the Headville and Bremond road, where he found defendant and Brown, T. J. Myatt, Tony Croell, and Bud Faircloth, all of said parties except Croell being relatives of Brown. When witness and McCutcheon reached the place of rendezvous, McCutcheon and Myatt retired from the crowd, talked a few minutes and then called Brown. They finally called witness to them. Neither Brown nor defendant said anything to the witness except that when witness asked who it was that hallooed when McCoy was shot Brown said, "It was Watson." The defendant was present when Brown made that statement, but did not say a single word— neither denied nor admitted that he uttered the halloo at the time of the shooting. At this point the witness was given the pistol in evidence. After examining it he exhibited the fact that two of the five cartridges, the weapon being a five shooter, showed no impression of the hammer; one of them showed by indentations on the rim that the hammer had been "snapped" on it at five different places on the rim; another showed

that it had been "snapped" on at two different places, and a third that it had been "snapped" on once. With regard to the two cartridges on which there were plural indentations the witness declared that the indentations could not have been made except by taking out and replacing or turning the said cartridges in the cylinder between the different fallings or "snappings" of the hammer. The witness gave the said pistol to Mrs. Coy. He next saw it in the grand jury room, and for the third time on this trial.

Witness made a close examination of the ground surrounding the place where McCoy received the fatal shot. He traced the tracks of the two horses—one ridden by Brown—that passed the field in which he was plowing, immediately on the trail of McCoy's large horse to the point where McCoy crossed Duck Creek. The two small horses thence traveled down the creek to the mouth of a dug-out, when they crossed the creek, whence they went up the creek on the bank to where McCoy crossed, and thence they followed so closely in the wake of McCoy's horse that the smaller of the two horses frequently stepped in the tracks of McCoy's big horse. At a point a short distance beyond the creek the tracks indicated that the horses got together and stopped, and from this point to the point where McCoy's horse was found dead all of the horses appeared to have run. McCoy's horse ran forty-seven yards and fell. The small horse, running to the right of McCoy's horse, stopped a short distance behind McCoy's horse, placing his rider in a position to shoot at McCoy from his rear. The horse running to the left of McCoy's horse ran to a point forty yards beyond where McCoy's horse fell, as if to cut off McCoy's flight, and came back ten yards, placing his rider at that point in a position to shoot at McCoy from in front.

On his cross-examination this witness said that McCoy's horse was shot just behind the left ear and in the small of the back on the left side, penetrating the back of the saddle. The range of the wound behind the left ear showed that the shot was fired from the rear of the horse. That of the wound in the back that that shot was fired from in front or very nearly in front of the horse.

William Roberts, testifying for the State, described somewhat more elaborately than the witness Wilson the trail of the horses from the point where they came together to the point where McCoy's horse was found dead. The substance of his testimony was that tracks showed McCoy's horse to have traveled at full speed from the point where the three tracks came together to the point where he fell dead, curving to the left around some brush a short distance from the place where he fell. The two small horses followed in a run, one to the right and the other to the left of the trail left by McCoy's horse, the small horse on the left running faster than the horse on the right. The small horse on the right stopped just before reaching the place where McCoy's horse curved around the brush.

"On a straight line from where this horse stopped, and about with Mc-Coy's horse's tail where he lay dead, some brush was shot, both behind and in front of the dead horse. The other small horse showed to have run fast, and to have run to the left of McCoy's horse and to have passed where McCoy's horse fell. Here was a plain sign where he held up to within about five or six steps of McCoy's dead horse, where there was another sign on the ground that showed a sudden stop." The witness now owned the saddle used by McCoy at the time he was shot. The shot holes, twelve in number, were in it yet, and showed that the missiles which made them, being the same that penetrated the horse's back, were fired from in front of the horse. The wound in the horse's neck or behind his ear showed that it was inflicted from behind.

C. J. Wilson, recalled by the State, identified the coat in evidence as the coat worn by McCoy when shot. The shot holes in this coat showed the shot to have entered McCoy's body from the left rear and to have ranged to the front. As shown by the threads and lint at the shot holes in the coat the shot entered the coat on the outside under the left arm, carrying the lint inward. The wound in McCoy's arm and that in his side and that in his horse's neck behind the ear showed the same course—from back to front. The tracks of the horses that passed the field in which the witness was at work, one of which was ridden by Brown, and those that followed McCoy's horse in the manner described corresponded in shape, size, and peculiarity and were made by the same horses.

Dr. Wilkins testified for the State that deceased died from the effects of two gunshot wounds. One was on the head, but witness could not say from his examination whether that wound was inflicted from behind or in front. The other wound was inflicted from the rear. It entered the left side and followed the course of the ninth rib. There was also a wound on the arm which appeared to have been inflicted from the rear. The State closed.

J. D. McCutcheon was the first witness for the defense. His examination in chief was directed to a review of the testimony of the State with regard to the tracks of the three horses. As to the general course pursued by the said horses after they severally crossed the creek there was no material difference between the testimony of this witness and that of the witnesses for the State, except that this witness denies that the tracks at any place showed that one of the small horses passed the large horse and suddenly doubled on the large horse's course. This witness, speaking by the appearance of the tracks, also testified positively that McCoy's horse at no place traveled out of a walk, and that neither of the small horses got out of a walk except at one place where one of them appeared to have jumped. This testimony the witness reiterated on cross-examination, and declared that defendant never admitted to him or told him that he, defendant, killed McCoy. On re-examination the witness

testified that W. R. Brown told him that he, Brown, killed McCoy, and that defendant had nothing whatever to do with the killing. The witness was Brown's brother-in-law.

Z. T. Howell, Brown's father-in-law, testifying for the defense, described the course pursued by McCoy's horse substantially as it was described by previous witnesses. He stated, however, that McCoy's horse at no place traveled in a gait faster than a walk. The tracks of the small horses showed them to have traveled in a walk "to a point within fifteen or twenty steps of where they were meeting McCoy after he turned from the creek and where McCoy's horse was dead. At this point they both wheeled and seemed to run up the creek. One horse tore up the ground considerably, the other some, not so much. There was no place where the small horse tracks overlapped the large ones." On cross-examination this witness stated that on the evening of the shooting the defendant called him from the field and told him that W. R. Brown had killed Mc-Coy and his horse on the creek and that he wanted the witness to get him Brown's coat.

J. D. Faircloth testified for the defense that he examined the trail of McCoy's horse on the Sunday evening after the fatal Friday. He saw many other horse tracks, but examined none of them. McCoy's horse at no time traveled faster than a walk.

Nat Holton testified for the defense that he met McCoy a week or ten days before his death. On that occasion McCoy told witness that W. R. Brown got his, McCoy's, cattle, and that if he ever caught said Brown in the woods he intended to fill him full of buckshot. On that same day the witness met Brown and told him what McCoy said.

John Jenkins testified for the defense that on the Tuesday preceding the fatal Friday he met McCoy, who asked him about some cattle. McCoy said, "I have lost some cattle. I know where some went to, but others I do not. The first time I see Bill Brown in the woods I am going to give him the devil." Witness repeated this conversation to Brown on the next day.

John Myatt testified for the defense that on the night of the fatal Friday W. R. Brown came to him at Bremond and surrendered, reporting that he had killed McCoy. The witness was then deputy sheriff. The defense closed.

In rebuttal the State introduced several witnesses who testified that they carefully examined the ground about the place of shooting, and the tracks of the three horses. These witnesses, in detail, corroborated the testimony of the preceding State's witnesses with regard to the tracks and other physical evidences on the ground. One of the said witnesses testified that he traced the wounds in the body of the dead horse, and found by actual experiment that the one behind the ear was inflicted from the rear, and the wounds in the back were inflicted from the front.

*Simmons & Crawford* filed an able brief and argument for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.—It is charged in the indictment that the defendant and one Brown "acted together" in murdering the deceased. The court instructed the jury that "if the defendant, acting by himself, or acting together with one W. R. Brown," etc., killed the deceased, etc. Defendant excepted to this instruction upon the ground that the indictment did not charge him *severally* with the commission of the murder, but charged that said murder was committed *jointly* by Brown and himself, and that therefore said instruction was inapplicable and unwarranted. We do not regard the exception as well grounded. If the indictment had simply charged that the defendant and Brown committed the murder, unquestionably a conviction under it would be sustained upon proof that he alone committed the murder, or that he acted together as a principal with Brown or with anyone else in its commission. Davis v. The State, 3 Texas Ct. App., 91; Gladden v. The State, 2 Texas Ct. App., 508; Williams v. The State, 42 Texas, 392. The allegation that the defendant and Brown *acted together* in the commission of the murder we regard as mere surplusage, not descriptive of the offense, not material in any respect, and as neither enlarging or restricting the responsibility or rights of the defendant. We are clearly of the opinion that under the indictment the defendant might legally be convicted of the murder, not only upon proof showing that he acted together with Brown in its commission, but upon proof showing that he committed it alone, without Brown in any manner being connected with its commission.

Another portion of the charge of the court was excepted to by the defendant on the grounds that it was unwarranted by the evidence and was upon the weight of the evidence. The portion of the charge referred to reads as follows: "The mere presence of a party at the time and place where an offense is committed does not constitute such party a principal; he must be present at the time and place with a knowledge of and participation in the offense. Of this the jury are to judge from the surrounding circumstances in proof, such as companionship of the parties and the conduct of defendant at, before, and after the commission of the offense." We think this paragraph of the charge was fully warranted by the evidence, and we are furthermore of the opinion that it is not upon the weight of evidence. To instruct the jury that a certain fact may be inferred upon proof of other facts without assuming that such other facts have been proved, is not always a charge upon the weight of evidence within the meaning of the rule. Sharpe v. The State, 17 Texas Ct. App., 486. Considered with reference to the evidence in this case we think said paragraph of the charge is correct.

Another paragraph of the charge was excepted to by the defendant. It reads as follows: "If you do not believe that defendant was present at the time of the killing you will acquit him." We see no error in this paragraph when it is considered in connection with the context and with other portions of the charge. The defense of alibi was not presented by the evidence any further than that no eye-witness testified that defendant was present at the time and place of the homicide. It was not shown by the defendant, or attempted to be shown, that he was at another place at the time of the homicide. There was no evidence demanding a charge as to the defense of alibi, and the instruction above quoted was more favorable to the defendant than was absolutely required.

Considering the charge of the court as a whole, we regard it as free of error. It is a clear, comprehensive, and correct statement of the principles of law applicable to the facts of the case.

One of the grounds of defendant's motion for a new trial is certain improper remarks made by counsel for the State in the closing address to the jury. There was no exception made to said remarks at the time they were made, and objections thereto are presented for the first time in the motion for a new trial. The objections come too late and can not be considered. It is only by proper bill of exception that such objections can be availed of on appeal, unless perhaps where it be clearly made to appear that the defendant has suffered injury from such improper remarks, and it is not so made to appear in this instance. Mason v. The State, 15 Texas Ct. App., 534; Jackson v. The State, 18 Texas Ct. App., 586.

There are certain papers in the record relating to the trial and acquittal of Brown subsequent to the conviction of the defendant, and defendant claims that Brown's testimony in his behalf is material, etc. These papers are not properly a part of the record, and we are aware of no rule of practice which would warrant us in giving them consideration.

But one other question is presented, and that is the sufficiency of the evidence to support the conviction. While the evidence is circumstantial, we think it is very cogent and conclusive of the defendant's guilt. To our minds it shows, beyond any reasonable doubt, that he participated in the murder of the deceased—a murder which the evidence in this case shows was a cowardly and deliberate assassination.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.