**Opinion issued July 1, 2021**



**In The**

# Court of Appeals

**For The**

# First District of Texas

—————————————————

**NO. 01-19-00826-CR**

—————————————————

**MAHAMMAD HAROON RASHID, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 458th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 14-DCR-066280C**

## MEMORANDUM OPINION

Without a sentencing recommendation, appellant Muhammad Haroon Rashid pleaded guilty to the offense of engaging in organized criminal activity, which—as charged in this case—was a first-degree felony. *See* TEX. PENAL CODE § 71.02(a)(1), (c). After preparation of a presentence investigation report and presentation of

additional evidence at the punishment hearing, the trial sentenced Rashid to 20 years in prison and ordered him to pay restitution to nine victims of his offense. *See* TEX. CODE CRIM. PROC. art. 42.037(a) (authorizing sentencing court to order defendant "to make restitution to any victim of the offense"). In one issue, Rashid contends that the evidence did not support the award of restitution to three of the purported victims.

We affirm as modified.

## Background

In March 2010, Christopher Reyes needed a loan for his Fort Bend County business. Gus Sosebee, acting as a broker, put Reyes in contact with Rashid and Gerald Hendrix, who were principals of Worldwide Resources USA. Reyes met with Rashid and Hendrix and signed an agreement with Worldwide for a loan. In the agreement, Worldwide committed to lend Reyes's business $360,000, and Reyes agreed to pay Worldwide a $36,000 commitment fee. The agreement provided that if the loan did not fund within 30 days, Worldwide would refund the commitment fee to Reyes.

By June 2010, Reyes had not received the loan, and Worldwide had not refunded the $36,000 commitment fee. Reyes contacted Sergeant MacDonough of the Sugar Land Police Department to report being defrauded by Worldwide. Sergeant MacDonough began an investigation, which lasted several years. Through

the investigation, Sergeant MacDonough discovered that Rashid and Hendrix, along with other co-actors, including Sosebee, used Worldwide and another company, Global Empire Investments, to perpetrate various schemes and scams to swindle money from unwitting parties in Texas and elsewhere.

During the investigation, Sergeant MacDonough learned that Reyes was not the only party to whom Rashid and Hendrix had failed to return a commitment fee after promising to provide a loan and then failing to do so. Sergeant MacDonough discovered that Progressive Minerals, LLC, had filed a lawsuit against Rashid and Hendrix in West Virgina for failing to return a $750,000 commitment fee. Sergeant MacDonough reviewed the pleadings and testimony from that suit and spoke with Progressive Minerals's attorney. Sergeant MacDonough learned that Progressive Minerals had sought a loan for $200,000,000 to purchase a mining company in West Virginia. After being referred to Global Empire, Progressive was given information representing that Global Empire was financially sound, even though it had filed Chapter 11 bankruptcy in December 2005.

After receiving information about Global Empire, Progressive Minerals and Global Empire entered into a loan agreement. As part of the agreement, Progressive Minerals paid Global Empire a $750,000 commitment fee conditioned on the loan being funded. The court filings identified Worldwide as an affiliated company of Global Empire, Rashid as Global Empire's and Worldwide's president, and Hendrix

as Global Empire's chief financial officer. Sergeant MacDonough also reviewed the testimony of Progressive Mineral's corporate representatives, given in October 2009. One of the representatives, Arch Moore, testified that, when he had contacted Global Empire about the loan not being funded, he had been stalled and told that the loan would still fund. Moore testified that Global Empire neither funded the loan, nor did it return the $750,000 commitment fee to Progressive Minerals.

Sergeant MacDonough also learned that Rashid and his co-actors had engaged in investment scams. For instance, Sergeant MacDonough discovered that, in September 2003, Robert Oyler had loaned $558,875 to Rashid and his associate, Jessie Botello, to use for a real estate investment. To obtain the funds, Oyler had taken out a second mortgage on his home. Although a promissory note between the parties required the loan's principal to be repaid by December 2013, Rashid and Botello never repaid the $558,875 to Oyler.

Sergeant MacDonough also learned that Chet Schickling provided $53,000 to Worldwide to finance the purchase of an airplane. Schickling had been introduced to Hendrix through another individual, Alan Hoover. After Schickling paid the $53,000 to Worldwide, the funds were transferred to Rashid's account. The aircraft was never purchased, and the funds were never repaid to Schickling.

In addition to the transactions involving Reyes, Progressive Minerals, Oyler, and Schickling, Sergeant MacDonough learned of numerous other loan and

4

investment schemes involving Rashid, Hendrix, their companies—Worldwide and Global Empire—and other co-actors, including Sosebee and Hoover. As a result, Rashid and Hendrix were arrested and indicted in Fort Bend County for multiple offenses.

In 2018, Rashid entered an open plea of guilty to the offense of engaging in criminal activity, charged as follows:

> [Rashid] on or about and between September 1, 2003 and December 31, 2013, did, unlawfully, with the intent to establish, maintain or participate in a combination—consisting of [Rashid] and two or more of the following: Gus Sosebee and or Gerald Hendrix and or Alan Hoover and or Jessie Botello and or others—or in the profits of a combination, did, then and there, between the dates mentioned above and pursuant to one scheme or continuing course of conduct, committed misapplication of property by a fiduciary of the aggregate value of $200,000 or more and or theft of the aggregate value of $200,000 or more and or money laundering of the aggregate value of the funds being $200,000 or more, with the intent to participate in the combination or in the profits of the combination.[1]

Following Rashid's guilty plea, the trial ordered the preparation of a presentence investigation (PSI) report. At the sentencing hearing, the State offered into evidence Rashid's PSI report. Hendrix's PSI report, from a separately filed case,

---

[1] Here, as permitted, the State chose not to name the complainants in the indictment. *See State v. Rivera*, 42 S.W.3d 323, 330 (Tex. App.—El Paso 2001, pet. ref'd) (recognizing that State is not required to include name of complainant in indictment charging defendant with engaging in organized criminal activity because "identity of the owner of the property allegedly stolen was incidental to the crime alleged"); *see also Moallen v. State*, 690 S.W.2d 244, 246 (Tex. Crim. App. 1985) (holding identification of complainant in charging instrument not required when not identified as element of charged offense).

was also admitted into evidence. Both PSI reports set out in detail Sergeant MacDonough's investigation. Hendrix's PSI report also contained his statement, which he had provided to the probation officer preparing the report, and the statements of the victims of Rashid's and Hendrix's schemes.

The State called eight witnesses to testify at the sentencing hearing. Each had been a victim of Rashid's and Hendrix's criminal activities. Reyes was among the witnesses. He testified that Rashid had paid him back the $36,000 commitment fee but explained that he had received the payment only after Rashid had been arrested, which was four years after the date the payment had been due.

Similarly, Jason Guidry testified that he entered into an agreement with Rashid and Hendrix to obtain a loan from Worldwide for $2,500,000. He paid Worldwide a commitment fee of $62,500 with the agreement that the fee would be refunded in "a short period of time" if the loan did not fund. Guidry paid the commitment fee to Worldwide in 2011, but the loan never funded. The commitment fee was returned to Guidry five years later, after Rashid was arrested.

Like Reyes and Guidry, Anders Erickson testified that he entered into an agreement with Rashid and Hendrix to obtain a $3,000,000 loan for his business, located in Hayes County, Texas. He paid a $70,000 commitment fee to Worldwide in March 2012 with the understanding that, if the loan did not fund in 90 days, the commitment would be returned. The loan did not fund, and he did not receive the

6

commitment fee back as agreed. Erickson requested his money back by emailing Rashid and Hendrix and speaking on the phone with Sosebee, but they did not return his commitment fee as requested. Ultimately, criminal charges were filed against Rashid in Hayes County regarding the matter. Erickson testified that he received his $70,000 commitment fee back from Rashid in exchange for agreeing that he would not pursue the criminal case against Rashid in Hayes County.

Oyler also testified at the punishment hearing about his experience with Rashid. He stated that, in 2003, he had loaned $558,875 to Rashid and Botello. He stated that, to obtain the funds, he had taken a second mortgage on his home. Oyler testified that he had signed a promissory note with Rashid. He stated that, contrary to the terms of the promissory note, Rashid had never paid any of the money back to him. He testified that, at one point, his home was posted for foreclosure, forcing him to refinance. Sixteen years after he loaned the money to Rashid, Oyler testified that he was still making monthly payments of $1,900 on the refinanced amount. He stated that he was 70 years old and had to continue working to make the payments.

Schickling testified that he had loaned $53,000 to Worldwide to finance the purchase of an airplane. He stated that the funds were immediately transferred to Rashid's bank account. He testified that he had never been repaid the funds, despite an agreement that he would be repaid.

7

The State also called B.J. White. She testified that, at Hendrix's request, she had wired $60,000 to him in May 2008 for an investment involving helicopters. She stated that she was aware that Rashid was Hendrix's partner. She testified that she was led to believe that she would receive $500,000 by July 2008, however, she had never received any money from Hendrix or Rashid, including the $60,000 she invested in 2008.

The State next called Lawrence Durbin. He testified that in 2009, Rashid and Hendrix asked him for a loan of $1.1 million. They represented to him that they had a Mexican bond worth $55 million, which they could use as collateral. Durbin entered into a contractual loan agreement with Worldwide, which Hendrix signed as chief financial officer. The terms of the agreement were that, within 45 days, Rashid would sell other Mexican bonds he held and then pay Durbin back the $1.1 million plus $400,000 in interest. Durbin testified that his $1.1 million was never returned.

Finally, Amy Tan testified that, in 2006, she loaned $40,000 to Rashid related to a real estate transaction. Rashid signed a promissory note agreeing to repay Tan. She also testified that she loaned Rashid additional money for an airline ticket. Tan testified that Rashid never repaid her any of the money as agreed.

In addition, Tan testified about a real estate transaction between Rashid and her friend, Wendy Wang. Tan explained that, in 2005, Wang agreed to sell real property she owned to Rashid, and the parties signed a contract. Wang deeded the

property to Rashid, who then took out several loans using the property as collateral without telling Wang. One of the lienholders ultimately foreclosed on the property. Besides Tan's testimony, the State offered documentary evidence relating to the real estate transaction, which showed that Rashid's conduct had cost Wang $2,250,000.

The State also offered hundreds of pages of bank and financial records, including those of Worldwide and documents showing the transfer of funds between accounts controlled by Rashid and Hendrix. The records included copies of checks and deposit slips supporting the claims of the victims who testified, showing that they had provided money to Rashid and his co-actors.

Among the bank records were documents reflecting that an individual named David Hamilton had written a check for $25,000 to Worldwide in May 2010. The memo line on the check had the notation "joint venture deposit." Hamilton wrote another check to Worldwide for $22,905. The memo line on that check stated, "loan advance." Deposit slips for Worldwide's bank account showed the same amounts deposited into its account.

In his PSI report statement, Hendrix said that Hamilton had "sought him out" and that the transaction with Hamilton "was a deal involving gold." Hendrix stated that Hamilton had "put up" $47,900, which was paid to Worldwide. Hendrix also said that "he" went to Africa regarding the deal, but it is unclear whether "he" refers to Hendrix or to Hamilton. Hendrix stated that $85,000 was spent on the trip "but

9

the deal never went through." Rashid made no statement in his PSI report regarding Hamilton. Neither Hamilton nor any other witness testified at the sentencing hearing about Hamilton's transactions with Worldwide and Hendrix. Under the victim statement portion of Hendrix's PSI report, the probation officer who prepared the report noted that he had sent "multiple emails" to Hamilton but "no response was received."

The bank records admitted into evidence also showed that another individual, Bradley Rotter, had wired $50,000 to Worldwide in 2011. In his PSI statement, Hendrix explained that he did not know Rotter but was aware that Rotter had "traveled with Alan Hoover to Mexico" to meet with Rashid "to invest $50,000." Hendrix said that he had investigated Rotter's company and had learned that the company was "not earning enough to pay their top salaries." Hendrix indicated that meant a deal with Rotter would not be in Worldwide's best interest. Hendrix did not state whether a deal was reached with Rotter but said that Rotter later paid Rashid another $2,000. But he did not explain the reason for the payment. The probation officer preparing the PSI report noted that, when contacted, Rotter said that he had already given a statement to a Fort Bend County assistant district attorney. The report contained no information about the content of that statement. Rashid's PSI report contained no information about Rotter, and Rotter did not testify at the sentencing hearing.

During closing arguments, the State requested that Rashid be sentenced to 60 years in prison because the evidence showed that he could not be rehabilitated. The State pointed out that, in addition to the witnesses' testimony, the PSI reports showed that "Progressive Minerals [had] sued Rashid for $750,000 based upon the same conduct that we've heard today." The PSI report detailed the information Sergeant MacDonough had learned during his investigation regarding the $750,000 commitment fee Rashid and his co-actors had taken from Progressive Minerals under the guise of providing a loan for the purchase of a mine in West Virginia.

At the end of the punishment hearing, the trial court sentenced Rashid to 20 years in prison. The trial court also ordered Rashid to make restitution to the following parties in the following amounts: (1) Robert Oyler ($468,000); (2) Lawrence Durbin ($1,100,000); (3) Chet Schickling ($53,000); (4) Amy Tan ($45,000); (5) B.J. White ($60,000); (6) Wendy Wang ($2,250,000); (7) David Hamilton ($47,005); (8) Bradley Rotter ($50,000); and (9) Progressive Minerals ($750,000).

Rashid now appeals, raising one issue.

### Restitution

On appeal, Rashid challenges the portion of the judgment ordering him to pay restitution to Progressive Minerals, Hamilton, and Rotter. He contends that the

11

award of restitution to those three parties was not supported by the evidence presented at the punishment hearing.

## A. Applicable Law

We review a challenge to a restitution order for an abuse of discretion. *Cartwright v. State*, 605 S.W.2d 287, 288–89 (Tex. Crim. App. 1980); *Ortegon v. State*, 510 S.W.3d 181, 184 (Tex. App.—Houston [1st Dist.] 2016, no pet.). An abuse of discretion occurs if the trial court acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Tyler v. State*, 137 S.W.3d 261, 266 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

The Court of Criminal Appeals has recognized that restitution "is a victim's statutory right." *Burt v. State*, 445 S.W.3d 752, 756 (Tex. Crim. App. 2014). The Code of Criminal Procedure provides that a trial judge "may order the defendant to make restitution to any victim of the offense." TEX. CODE CRIM. PROC. art. 42.037(a). The State bears the burden of proving by a preponderance of the evidence "the amount of loss sustained by a victim as a result of the offense."[2] *Id.* art. 42.037(k). To order restitution, the court must consider "the amount of loss sustained

---

[2] "Preponderance of the evidence means the greater weight and degree of credible evidence that would create a reasonable belief in the truth of the matter." *Ex parte Garza*, 603 S.W.3d 492, 496 (Tex. App.—Corpus Christi 2020, no pet.) (citing *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 706 n.8 (Tex. App.—Amarillo 2018, pet. denied)).

by a victim," and "other factors the court deems appropriate." *Id.* art. 42.037(c). Courts must also be mindful of three due-process limitations: (1) the restitution ordered must be only for the offense for which the defendant is criminally responsible; (2) the restitution must be only for the victim or victims of the offense for which the defendant is charged; and (3) the amount must be just and supported by a factual basis in the record. *Burt*, 445 S.W.3d at 758; *Campbell v. State*, 5 S.W.3d 693, 696–97 (Tex. Crim. App. 1999).

## B.     Analysis

In challenging the sufficiency of the evidence to support the restitution order, Rashid emphasizes that no representative from Progressive Minerals testified at the punishment hearing nor did Hamilton or Rotter. Rashid acknowledges that both PSI reports contain information about Progressive Minerals, and Hendrix's PSI report contains information about Hamilton and Rotter, but he asserts that the reports—to which he did not object at the punishment hearing—cannot support the restitution award because they are hearsay.

In support of his argument, Rashid cites *Cartwright v. State*, 605 S.W.2d 287, 289 (Tex. Crim. App. 1980). There, the trial court ordered restitution based on a presentence investigation report that mentioned the victim's financial losses but did not contain any documentation of those losses. *Id.* The Court of Criminal Appeals held that, because the report was hearsay, it was insufficient to establish the amount

13

of restitution. *Id.* However, since *Cartwright* was decided, Texas Rule of Evidence 802 was adopted, "which treats hearsay admitted without objection the same as all other evidence in that it is capable of sustaining a verdict." *Maloy v. State*, 990 S.W.2d 442, 445–46 (Tex. App.—Waco 1999, no pet.); *see* TEX. R. EVID. 802 ("Inadmissible hearsay admitted without objection may not be denied probative value merely because it is hearsay.").

Citing Rule 802, several courts—including this Court—have held that an unobjected-to presentence investigation report, although hearsay, is sufficient to sustain an order of restitution. *See, e.g.*, *Scott v. State*, No. 03-15-00096-CR, 2016 WL 4506156, at *5 (Tex. App.—Austin Aug. 24, 2016, no pet.) (mem. op., not designated for publication) (holding that PSI report, to which defendant did not object, provided sufficient factual basis to support restitution award); *Nugent v. State*, No. 01–05–00775–CR, 2006 WL 2893429, at *2 (Tex. App.—Houston [1st Dist.] Oct. 12, 2006, pet. ref'd) (mem. op., not designated for publication) (holding that unobjected-to PSI report—containing detailed breakdown of each victim of appellant's offense and amount of loss each had sustained as result of charged offense—was sufficient factual basis to support restitution to victims who did not testify at sentencing hearing); *Harrison v. State*, 713 S.W.2d 760, 764 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd) (holding that list of expenses in PSI report, which was not objected to, provided factual basis to support restitution order).

14

Moreover, the Court of Criminal Appeals has made clear since *Cartwright* that, "generally, the rules of evidence do not apply to the contents of [a] PSI [report]." *Fryer v. State*, 68 S.W.3d 628, 631 (Tex. Crim. App. 2002); *see Snow v. State*, No. 03-12-00573-CR, 2014 WL 3411209, at *1 (Tex. App.—Austin July 10, 2014, no pet.) (mem. op., not designated for publication) (concluding that trial court properly considered PSI report in awarding restitution because rules of evidence do not apply to PSI reports). Thus, the trial court in this case was permitted to rely on the PSI reports to determine whether to award restitution.

Rashid also contends that, even considering the PSI reports, the evidence was not sufficient to support restitution to Progressive Minerals, Hamilton, and Rotter. Rashid asserts that the evidence failed "to show [a] nexus" between his conduct, for which restitution was awarded, and "the crime for which [he] was convicted." As mentioned, Code of Criminal Procedure article 42.037(a) permits a sentencing court to order a defendant to pay restitution to "any victim of the offense." TEX. CODE CRIM. PROC. art. 42.037(a). We interpret Rashid's argument to be an assertion that the State failed to show that Hamilton, Rotter, and Progressive Minerals were "victims" of his offense of engaging in criminal activity, as statutorily required for them to be awarded restitution. *See id.*

"[F]or purposes of the restitution statute, a 'victim' is any person who suffered loss as a direct result of the criminal offense." *Hanna v. State*, 426 S.W.3d 87, 94

15

(Tex. Crim. App. 2014). "The phrase 'as a result of the offense' includes the notion of both actual and proximate causation." *Id.* at 95. "[T]he damages must be a 'direct' result of the defendant's criminal offense—that is, the State must prove, by a preponderance of the evidence, that the loss was a 'but for' result of the criminal offense and resulted 'proximately,' or foreseeably, from the criminal offense." *Id.* Included in his argument, Rashid contends that the State's decision not to name Hamilton, Rotter, and Progressive Minerals as complainants in the indictment limits their ability to recover restitution; however, the Court of Criminal Appeals has made clear that restitution "may be ordered for someone whose name did not appear in the charging instrument," so long as the State proves that "the defendant's commission of the offense was the direct cause of the harm." *Id.* at 89–90.

With respect to the offense of engaging in organized criminal activity, Rashid pleaded guilty to the charges in the indictment, judicially admitting that, "with the intent to establish, maintain or participate in a combination—consisting of [Rashid] and two or more of the following: Gus Sosebee and or Gerald Hendrix and or Alan Hoover and or Jessie Botello and or others—or in the profits of a combination," he committed "[1] misapplication of property by a fiduciary of the aggregate value of $200,000 or more and or [2] theft of the aggregate value of $200,000 or more and or

16

[3] money laundering of the aggregate value of the funds being $200,000 or more,"[3] "pursuant to one scheme or continuing course of conduct" between the dates of September 1, 2003 and December 31, 2013.

## 1.    Progressive Minerals

We begin by determining whether the State offered sufficient evidence to show, by a preponderance of the evidence, that Rashid's commission of the charged offense of engaging in organized criminal activity was a direct cause of Progressive Minerals's loss of its $750,000 loan commitment fee. In other words, we determine whether the evidence was sufficient for the trial court to have concluded that Progressive Minerals was a victim of the offense.

Evidence supporting the $750,000 restitution award to Progressive Minerals was contained in Rashid's and Hendrix's PSI reports. The reports detail the findings

---

[3]    The indictment alleges Rashid committed the offense of engaging in organized criminal activity between September 1, 2003 and December 31, 2013. During that period, the Penal Code classified the predicate offenses of (1) misapplication of fiduciary property, (2) theft, and (3) money laundering as first-degree felony offenses, if the value of the property involved was $200,000 or more. *See* Act of May 30, 2003, 73d Leg., R.S., ch. 900, § 1.01, sec. 32.45, 1993 Tex. Gen. Laws 3586, 3653 (amended 2015) (current version at TEX. PENAL CODE § 32.45(c)(7) (requiring $300,000 or more in property misapplied to constitute first-degree felony)); Act of June 19, 2003, 73d Leg., R.S., ch. 900, § 1.01, sec. 31.03, 1993 Tex. Gen. Laws 3586, 3638 (amended 2015) (current version at TEX. PENAL CODE § 31.03(e)(7) (requiring $300,000 or more in property stolen to constitute first-degree felony)); Act of Sept. 1, 2005, 79th Leg., R.S., ch. 1162, § 2, sec. 34.02, 2005 Tex. Gen. Laws 3802, 3803 (amended 2015) (current version at TEX. PENAL CODE § 34.02(e)(4) (requiring $300,000 or more in funds laundered to constitute first-degree felony)).

of Sergeant MacDonough's investigation, through which he learned that Rashid and Hendrix failed to return Progressive Minerals's $750,000 loan commitment fee, resulting in a suit by Progressive Minerals against Rashid and Hendrix. The PSI reports document that Progressive Minerals entered into an agreement with Global Empire—of which Rashid was president—to obtain a loan for $200,000,000 for the purchase of a mining company in West Virginia. Progressive Minerals paid Global Empire the $750,000 commitment fee conditioned on the loan being funded. Before entering into the loan agreement, Progressive Minerals was presented with information representing that Global Empire was financially sound, even though Global Empire had filed Chapter 11 bankruptcy in December 2005. A representative of Progressive Minerals, Arch Moore, testified in October 2009 that he had contacted Global Empire about the status of the loan, but he was stalled and told that the loan would still fund. Moore also testified that Global Empire never funded the loan nor did it return Progressive Minerals's $750,000 commitment fee. Other evidence—specifically, witness testimony, the PSI reports, and bank records—showed that Rashid and his co-actors had collaborated to commit an array of offenses pursuant to a common scheme, including misappropriating and misapplying loan commitment fees of other borrowers, such as Reyes, Guildry, and Erickson. Thus, the State's evidence was sufficient—by a preponderance of the evidence—for the trial court to have exercised its discretion to determine that Progressive Minerals was

a victim of Rashid's offense of engaging in criminal activity. That is, the evidence sufficiently showed that Progressive Minerals's loss of $750,000 was a direct result of the offense. *See Hanna*, 426 S.W.3d at 94.

In his brief, Rashid cites *Martin v. State* as support for his argument that there was an insufficient nexus between the award of restitution to Progressive Minerals and the charged offense. 874 S.W.2d 674 (Tex. Crim. App. 1994). In *Martin*, the defendant was indicted and convicted of defrauding one investor in the amount of $3,717.19. *Id.* at 675. As a condition of probation, the trial court ordered the defendant to pay restitution in the amount of $65,179.08, which was half the total amount allegedly lost by approximately 40 investors. *Id.* On appeal, the Court of Criminal Appeals held that the amount of restitution awarded could not include amounts owed to victims of other crimes for which the defendant had not been charged or convicted. *Id.* at 677–78.

Unlike the facts in *Martin*, Rashid was charged with, and pleaded guilty to, the offense of engaging in organized criminal activity, which by its nature may have multiple victims. As charged here, the offense was not limited to the commission of one predicate offense with only one victim but, as shown by the evidence, had many victims resulting from Rashid and his associates acting in combination over many years to perpetrate illegal schemes. *Cf. O'Brien v. State*, 544 S.W.3d 376, 379 (Tex. Crim. App. 2018) ("We hold that the commission of each predicate crime constitutes

19

a different manner and means of committing the single offense of engaging in organized criminal activity."). Thus, Rashid's reliance on *Martin* is misplaced.

Rashid also contends that the State did not provide evidence to show that the transaction between Progressive Minerals occurred between September 1, 2003 and December 31, 2013, the period during which the indictment alleged Rashid had committed the offense of engaging in criminal activity. However, the PSI reports indicate that Progressive Minerals agreed to the loan transaction with Rashid's company, Global Empire, based on information that the company was financially sound, when in fact it had filed Chapter 11 bankruptcy in December 2005. In addition, the PSI reports state that Progressive Minerals's corporate representative, Arch Moore, testified in the suit filed by Progressive Minerals against Rashid in 2009. The dates provided in PSI reports provide a basis from which the trial court could have reasonably determined that the predicate offense involving Progressive Minerals occurred between September 1, 2003 and December 31, 2013.

Finally, Rashid asserts that the trial court abused its discretion in awarding restitution to Progressive Minerals because the evidence did not "provide information from which appropriate venue could be determined." We conclude Rashid's argument is without merit.

The State was not required to establish the venue of each predicate offense or act supporting the charged offense of engaging in organized criminal activity,

including any act or conduct related to the transaction involving Progressive Minerals. Rather, the offense of engaging in organized criminal activity "may be prosecuted in any county in which *any* act is committed to effect an objective of the combination." TEX. CODE CRIM. PROC. art. 13.21 (emphasis added); *see Ford v. State*, 282 S.W.3d 256, 266 (Tex. App.—Austin 2009, no pet.) (recognizing that offense of engaging in organized criminal activity may be prosecuted in any county in which any act is committed to further objective of the combination). Rashid makes no argument that Fort Bend County was not the proper venue for his offense of engaging in organized criminal activity to be prosecuted. *See* TEX. R. APP. P. 44.2(c)(1) (providing that, "[u]nless the [matter was] disputed in the trial court, or unless the record affirmatively shows the contrary, the court of appeals must presume . . . that venue was proved in the trial court").

We conclude that the evidence supported the trial court's determination that Progressive Minerals was entitled to $750,000 in restitution from Rashid. We hold that the trial court did not abuse its discretion by ordering Rashid to make that restitution. We overrule the portion of Rashid's sole issue challenging the restitution to Progressive Minerals.

### 2.    Hamilton and Rotter

We turn to whether the evidence supported a determination that Hamilton, who was awarded $47,005 in restitution, and Rotter, who was awarded $50,000 in

restitution, were victims of Rashid's offense of engaging in criminal activity. We review the evidence to ascertain whether the evidence supported a determination that Hamilton and Rotter suffered a loss as a direct result of the criminal offense. *See Hanna*, 426 S.W.3d at 94.

Bank records admitted into evidence at the punishment hearing reflected that Hamilton wrote a check for $25,000 to Worldwide in May 2010. The memo line on the check had the notation "joint venture deposit." Hamilton wrote another check to Worldwide for $22,905. The memo line on that check stated, "loan advance." Deposit slips for Worldwide's bank account showed the same amounts deposited into its account.

In his statement in the PSI report, Hendrix said that Hamilton had "sought him out" and that the transaction with Hamilton "was a deal involving gold." Hendrix stated that Hamilton had "put up" $47,900, which was paid to Worldwide. Hendrix also said that "he" went to Africa regarding the deal, but it is unclear whether "he" refers to Hendrix or to Hamilton. Hendrix stated that $85,000 was spent on the trip "but the deal never went through." Rashid made no statement in his PSI report regarding Hamilton. Neither Hamilton nor any other witness testified at the sentencing hearing about Hamilton's transactions with Worldwide and Hendrix. Under the victim statement portion of Hendrix's PSI report, the probation officer

who prepared the report noted that he had sent "multiple emails" to Hamilton but "no response was received."

The bank records admitted into evidence also showed that Rotter had wired $50,000 to Worldwide in 2011. In his PSI statement, Hendrix explained that he did not know Rotter but was aware that Rotter had "traveled with Alan Hoover to Mexico" to meet with Rashid "to invest $50,000." Hendrix said that he investigated Rotter's company and had learned that the company was "not earning enough to pay their top salaries." Hendrix indicated that meant a deal with Rotter would not be in Worldwide's best interest. Hendrix did not state whether a deal was reached with Rotter but said that Rotter later paid Rashid another $2,000. Hendrix did not state the reason for the payment. The probation officer preparing the PSI report noted that, when contacted, Rotter said that he had already given a statement to a Fort Bend County assistant district attorney. The report contained no information about the content of the statement. Rashid's PSI report contained no information about Rotter, and Rotter did not testify at the sentencing hearing.

We agree with Rashid that the evidence was insufficient to show, by a preponderance of the evidence, that Hamilton and Rotter suffered a loss as a direct result of Rashid's offense of engaging in criminal activity. Unlike Progressive Minerals's loss, the evidence regarding Hamilton's and Rotter's transactions did not show that any losses incurred by Hamilton and Rotter were "but for" results of the

23

offense. *See id.* While the evidence related to Progressive Minerals provided details about the transaction between it and Global Empire regarding what had been represented to Progressive Minerals regarding Global Empire's financial stability, the terms of the loan transaction, and the return of its commitment fee, no equivalent evidence was presented regarding the business dealings between Hamilton or Rotter and Rashid or his cohorts. And, because there was no evidence regarding the terms of the business dealings, there was no evidence that Hamilton and Rotter expected a return of any or all the funds they paid to Worldwide. Any award of restitution to Hamilton or Rotter would be based on speculation that they suffered a loss as a direct result of Rashid's offense.

We conclude that the evidence did not support a determination by the trial court that Hamilton and Rotter were victims of Rashid's offense entitling them to restitution under article 42.037(a).[4] We hold that the trial court abused its discretion

---

[4]  As support for the restitution awards to Hamilton and Rotter, the State points to an offense report from the Sugar Land Police Department found only in the clerk's record. The State represents that the offense report was offered as an exhibit at Rashid's plea hearing. The offense report bears a "State's Exhibit 2" sticker on its first page, but there is no indication that it was admitted into evidence at the plea hearing. To the contrary, the reporter's record from the plea hearing indicates that State's Exhibit 2 was a "Waiver of Appeal," signed as part of his plea agreement. The offense report was also not referenced or mentioned at the punishment hearing. *Cf. Heberling v. State*, 834 S.W.2d 350, 356 (Tex. Crim. App. 1992) (holding that evidence which, although not formally introduced is nevertheless treated by trial court and parties as if it had been, may be considered on appeal as if admitted). "When documents appear in the clerk's record that have not been introduced in evidence, they cannot be considered as part of the record." *Webber v. State*, 21 S.W.3d 726, 731 (Tex. App.—Austin 2000, pet. ref'd) (citing *Chambers v. State*,

when it ordered Rashid to make restitution to Hamilton and Rotter. Therefore, we sustain the remainder of Rashid's sole issue, and modify the judgment to delete the award of restitution to Hamilton and to Rotter. *See Burt*, 445 S.W.3d 752, 757–58 (holding that deletion of written restitution order is appropriate either when trial judge does not have statutory authority to impose specific restitution order or when evidence does not show proximate cause between defendant's criminal conduct and victim's injury); *see also* TEX. R. APP. P. 43.2(b) (providing that court of appeals may "modify the trial court's judgment and affirm it as modified"); *Kelley v. State*, No. 03-19-00040-CR, 2021 WL 81691, at *7 (Tex. App.—Austin Jan. 8, 2021, no pet.) (mem. op., not designated for publication) (deleting restitution award from trial court's judgment after holding that evidence was insufficient to support determination that recipient of award was "victim" for restitution purposes).

---

194 S.W.2d 774, 775 (Tex. Crim. App. 1946); *Watson v. State*, 12 S.W. 404, 404–05 (Tex. App. 1889)). Therefore, we do not consider the offense report in the analysis of whether restitution was properly awarded in this case.

## Conclusion

We affirm the judgment of the trial court as modified.

Richard Hightower
Justice

Panel consists of Justices Goodman, Hightower, and Rivas-Molloy.

Do not publish. Tex. R. App. P. 47.2(b).